1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   THOMAS BOTELL, et al.,

11            Plaintiffs,                    No. 2:11-cv-1545 GEB GGH

12       vs.

13   UNITED STATES OF AMERICA,

14            Defendant.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   INTRODUCTION AND SUMMARY

17            Previously pending on this court's law and motion calendar for February 14, 2013,

18   was plaintiffs' motion for sanctions, filed December 24, 2013.  Steven Campora appeared for

19   plaintiffs.  J. Earlene Gordon represented defendant.  After reviewing the papers filed in

20   conjunction with the motion and having heard oral argument, the court now issues the following

21   findings and recommendations.

22            Over the course of hearing several motions to compel brought by plaintiffs, it has

23   become all too apparent that defendant has purposely destroyed material evidence in this case,

24   specifically the retaining wall that caused Tommy Botell's death and injury to his sister, plaintiff

25   K.B.  For this reason, the court must recommend sanctions in the form of a finding of negligence

26   by defendant in causing this death and injury.  What is less clear, although highly suspicious, is

1    whether defendant spoliated evidence, other than the wall, that pertains to its defense of

2    discretionary function exception.  Based on the evidence presented herein, the court cannot

3    conclusively determine that such spoliation occurred without holding an evidentiary hearing.  As

4    such matters must be presented to the district court as fact finder, the undersigned is of the

5    opinion that this issue must await decision by Judge Burrell.  Therefore, plaintiffs' second

6    request, that the court establish that the discretionary function exception is not a bar to plaintiffs'

7    claims, should not be granted at the present time.

8    BACKGROUND

9             This is a wrongful death and personal injury action, filed June 8, 2011.  Plaintiffs

10   are the Botell family, who allege that while visiting Lassen Volcanic National Park ("LAVO" or

11   "Park") on July 29, 2009, children Tommy and K.B. Botell were sitting on a mortared rock wall

12   to rest during a hike, when it gave way and rolled downhill, causing Tommy's death and injuring

13   K.B.  Plaintiffs are K.B., her sister B.B., through their guardian ad litem, Jennifer Botell, who

14   were present and their parents, Thomas and Jennifer Botell, who were also present at the

15   incident.  The complaint alleges wrongful death, personal injury - negligence, and negligent

16   infliction of emotional distress.  As one of its defenses to this FTCA action, defendant relies on

17   the discretionary function exception.

18   DISCUSSION

19            Plaintiffs seek sanctions for spoliation and failure to maintain indispensable

20   evidence pursuant to the court's inherent power.  The issues raised by plaintiffs' motion can best

21   be categorized as follows: (1) whether defendant spoliated evidence in regard to the condition of

22   the subject retaining wall; and (2) whether spoliation of evidence occurred with respect to

23   defendant's claimed discretionary function exemption.

24       I.  Legal Standards

25            Rule 37 authorizes "a wide range of sanctions" for a party's failure to comply with

26   discovery rules or court orders enforcing them.  Wyle v. R.J. Reynolds Industries, Inc., 709 F.2d

2

585, 589 (9th Cir. 1983).  Penalizing a party "for dilatory conduct during discovery proceedings" is discretionary.  Bollow v. Federal Reserve Bank of San Francisco, 650 F.2d 1093, 1102 (9th Cir. 1981) (citing Fed. R. Civ. P. 37(a)(4)).

In addition to Rule 37 sanctions, "[c]ourts are invested with inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp., 982 F.2d 363, 368 (9th Cir. 1992) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132 (1991)); accord Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (recognizing inherent power to dismiss counterclaim for concealing discovery documents); Winn v. Associated Press, 903 F. Supp. 575, 580 (S.D.N.Y. 1995) (imposing monetary sanctions for deliberately impeding discovery and willful noncompliance with document production).

Precluding evidence so that the recalcitrant party cannot support defenses is comparable to entering dismissal, which "represent[s] the most severe penalty that can be imposed." U.S. v. Kahaluu Const., 857 F.2d 600, 603 (9th Cir. 1988); accord, Valley Engineers v. Electric Engineering Co., 158 F.3d 1051 (9th Cir. 1998).  Accordingly, such sanctions are authorized only in "extreme circumstances" for violations "due to willfulness, bad faith, or fault of that party." Kahaluu Const., 857 F.2d at 603; see also Commodity Futures Trading Com'n v. Noble Metals Intern., Inc., 67 F.3d 766,770 (9th Cir. 1995) (affirming standard and upholding sanctions in egregious circumstances).[1]  Bad faith does not require actual ill will; substantial and

---

[1]  See also, e.g., Fjelstad v. American Honda Motor Co., Inc., 762 F.2d 1334, 1338 (9th Cir. 1985) ("'Where the drastic sanction of dismissal . . . [is] imposed . . . the range of discretion is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith,'" quoting Sigliano v. Mendoza, 642 F.2d 309, 310 (9th Cir.1981); G-K Properties v. Redevelopment Agency, 577 F.2d 645, 647-48 (9th Cir.1978) (bad faith crucial in Rule 37 dismissal, citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S. Ct.  2778 (1976)); Henry v. Gill Industries, Inc, 983 F.2d 943, 946, 948-49 (9th Cir.1993) (reviewing Rule 37 dismissal under multiple factors, including willfulness, bad faith or fault); Porter v. Martinez, 941 F.2d 732, 733 (9th Cir.1991) (reviewing Rule 37 default judgment

1  prejudicial obduracy may constitute bad faith.  <u>B.K.B. v. Maui Police Dept</u>., 276 F.3d 1091, 1108

2  (9th Cir. 2002).

3         Five relevant factors also determine whether severe sanctions are appropriate:

4         (1) the public's interest in expeditious resolution of litigation;
       (2) the court's need to manage its docket;

5         (3) the risk of prejudice to the other party;
       (4) the public policy favoring disposition of cases on their merits;

6         and
       (5) the availability of less drastic sanctions.

7

8  <u>Wanderer v. Johnston</u>, 910 F.2d 652 (9th Cir. 1990) (default judgment for defendants' failure to

9  comply with discovery); <u>Malone v. U.S. Postal Service</u>, 833 F.2d 128, 130 (9th Cir.1987).

10         This circuit has acknowledged that "[l]ike most elaborate multifactor tests, our

11  test has not been what it appears to be, a mechanical means of determining what discovery

12  sanction is just." <u>Valley Engineers Inc.</u> 158 F.3d at 1056.  Inevitably where a court order is

13  violated or discovery belatedly is produced, factors 1 and 2 support preclusive sanctions, and

14  factor 4 cuts against them.  Prejudice to the opposing party and the availability of less drastic

15  sanctions, factors 3 and 5, are most often decisive.  <u>Id</u>.  Most critical for evaluating the risk of

16  prejudice and whether less drastic sanctions would suffice is whether the discovery violations "so

17  damage[] the integrity of the discovery process that there can never be assurance of proceeding

18  on the true facts." <u>Valley Engineers Inc.</u>,158 F.3d at 1058.

19      II.  <u>Analysis</u>

20         A.  <u>Spoliation in Regard to the Physical Condition of the Retaining Wall</u>

21         After the incident which is the subject of this action, the facts indicate a willful

22  spoliation of the retaining wall by Park staff.  First, on the day of the incident, John Roth told

23  Investigative Services Branch Special Agent Alan Foster that he wanted the investigation to be

24  conducted by LAVO employees, contrary to NPS policy, even though he did not go to the scene

25

26  pursuant to multiple factors including bad faith); <u>Wanderer v. Johnston</u>, 910 F.2d 652, 655-56
(9th Cir.1990) (same).

1   until 30 days after the accident, for unrelated reasons.  LAVO delayed commencement of an

2   investigation until three weeks after the accident, and then NPS Investigative Services Branch

3   took over, through Alan Foster.  (Foster Dep., dkt. no. 77-3 at 4.)

4           Second, NPS-50 provides that where there is a serious accident, the area must be

5   secured and a Board of Inquiry is required.  (NPS-50, Chap. 6 at 13, dkt. no. 77-3 at 20; Martin

6   Dep., dkt. no. 77-3 at 24-25.)  Darlene Koontz violated this policy by ordering the remaining

7   portion of the retaining wall knocked down before NSP Special Agent Foster could inspect.

8   (Martin Dep., dkt. no. 77-3 at 26-27.)  Foster testified that this act compromised his

9   investigation, and the scene was not documented to the level he thought it needed to be.  (Foster

10  Dep., dkt. no. 77-3 at 7-8.)  Plaintiffs are unsure of the date of the destruction; it may have been

11  after defendant received plaintiffs' preservation of evidence letter, but was sometime between

12  July 29 and August 12, 2009.  (Baxter Dep., dkt. no. 77-3 at 58-63; Lamkins Dep., dkt. no. 77-4

13  at 4-8.)

14          Furthermore, according to Special Agent Foster at his deposition, LAVO made no

15  effort to close the trail.  He testified: "There was no – aside from a barrier closing the trail, which

16  consisted of some plastic safety fencing stretched between fence posts and a sign indicating that

17  the area was closed to the public, there was no restriction otherwise within that area that would

18  mark it as consistent with, for instance, a crime scene to preserve it and keep people out of it."

19  (Foster Dep., dkt.  no. 77-3 at 6.)  Defendant responds that "the Trail was in fact closed to the

20  public following the accident;" however, defendant does not point to evidence supporting this

21  statement.  (Opp. at 6:19-20.)  In fact, defendant could point to no documentation of the decision

22  to keep the trail open rather than close it.  At hearing, defense counsel, in discussing why the wall

23  was knocked down, conceded that "[p]eople were – although the trail was closed to the public,

24  people were still accessing the trail.  David Harry and Susan Dolan climbed the trail so that she

25  could examine the walls for purposes of determining their historical significance for the

26  environmental assessment."  (Hr'g Tr., dkt. no. 90 at 6:7-11.)  Defendant's position is difficult to

1    maintain.  If the trail was closed to the public, why was it necessary to knock down the remaining

2    portion of the wall?  If the trail was not completely closed off because certain Park individuals

3    had to access it and the wall was purportedly dangerous to them, why was it not completely

4    closed off in light of NPS-50, and the serious accident that had occurred there?  Mr. Martin's

5    testimony contradicts defendant's purported reason.  He stated that Ms. Koontz ordered the wall

6    knocked down because she wanted the trail to be re-opened to the public, not for anyone's safety.

7    (Martin Dep., dkt. no. 77-3 at 26-27.)

8          In regard to documentation of the condition of the trail directly following the

9    accident, Foster testified that in his professional opinion, although some work had been done, it

10   was necessary to more closely photograph, document, measure and capture global position

11   system coordinates and such work had not been done.  (Id. at 29-30.)  Ron Martin, LAVO Ranger

12   Operation Supervisor, testified that the area was not secured because people were able to go and

13   knock the wall down.  (Martin Dep., dkt. no. 77-3 at 25.)

14         Plaintiffs further point to a Directive entitled, "Inspection and Hazard Control,"

15   which requires a notice of unsafe condition be drafted and signed by the Superintendent and

16   immediately posted, to remain at the site until the danger has abated.  Furthermore, if there are

17   hazards, employees shall correct them if possible and if they cannot be corrected, and pose a

18   threat, they should be blocked off to prevent an accident and closed.  (Pls.' Reply, dkt. no. 88-3 at

19   31-32.)  This directive was part of the LAVO Environmental Health and Safety Program which

20   Koontz testified was mandatory.

21         It is true that two trail workers were instructed to look at the retaining wall and if

22   anything was "awry or dangerous, to make it as safe as possible."  (Lamkins Dep., dkt. no. 82-1

23   at 2; Baxter Dep., dkt. no. 82-2 at 2.)  Both employees testified that they were instructed to kick

24   off what was left of the wall that had come down in the accident because it was unsafe, and they

25   did so within a week or so of the accident, which would have preceded Mr. Steinfeld's August

26   12, 2009 letter to preserve evidence. (Lamkins Dep., dkt. no. 82-1 at 2, dkt. no. 77-4 at7; Baxter

Dep., dkt. no. 82-2 at 2, 4.)  The trail was also closed to the public after the accident, or so

counsel was told. (Steinfeld Dec., Ex. 2, dkt. no. 77-6 at 7.)

     The Steinfeld preservation letter also requested that plaintiffs' expert be permitted

to observe the investigation, and was addressed to Koontz and Foster.  In response, Karen

Glasgow,[2] assistant field solicitor to the Department of the Interior, stated on August 18, 2009,

"at this stage of the investigation there is nothing for your expert to observe as the site visits and

witness interviews have concluded."  (Id., Exs. 1, 2, dkt. no. 77-6 at 4-7.)  She also responded to

Steinfeld's request to preserve evidence by stating that "the piece of retaining wall which

dislodged fell approximately 1000 ft below the trail, where it still lays." (Id., Ex. 2, dkt. no. 77-6

at 7.)  In truth, defendant had already knocked down the remaining portion of the retaining wall

by August 18, 2009, and the Foster investigation did not even begin until August 24, 2009.

     This evidence shows that the trail was never closed completely in the sense that

the public could not traverse below and around the wall for a period of time, certainly not before

the unsafe portion of the wall was knocked down.  Based on the accident and the condition of the

wall and trail immediately following it, there were only two alternatives available to Park

employees, both of which necessitated leaving the retaining wall intact.  As to the first

possibility, due to the nature of the tragic accident occurring on this trail, the condition was so

dangerous that the entire trail and wall should have been closed off to the public, including the

areas below the unstable retaining wall in order to prevent imminent injury, and a thorough

investigation conducted, with the remaining wall intact and not destroyed.  In the alternative, if

Park employees believed the trail and remaining wall were not imminently dangerous, as they

apparently did, and they therefore decided not to close the trail completely, they could have

erected appropriate barriers and precautions to permit the public to use certain portions of the

trail; however, the wall still should have been preserved in its untouched post-accident condition

---

[2]  This attorney represented defendant from within days of the accident.

1   until a thorough investigation was completed.  No matter how the situation is considered, under

2   either alternative the court finds that defendant unnecessarily spoliated evidence by destroying

3   the remaining portion of the wall.

4          And, there is no doubt that the scene of the accident, i.e., the remaining part of the

5   wall, was important for investigative purposes.  Agent Foster so declared, and the court finds his

6   evidence compelling.  It also complies with common sense that a remaining part of an "unsafe

7   wall" would speak volumes about why the accident occurred.

8          In regard to preserving evidence, Park employees Roth, Jones and Haner all

9   testified that they were never instructed to preserve documents.  (Haner Dep., dkt. no. 88-3 at 4-

10  5; Jones Dep., dkt. no. 88-2 at 64; Roth Dep., dkt. no. 88-2 at 38.)  Plaintiffs have presented

11  further evidence that defendant additionally failed to administer litigation hold notices and to

12  suspend its practice of automatically deleting emails after thirty days, which practice has

13  apparently continued to the present.  In response to Special Interrogatory 16, requesting a

14  description of all efforts taken to preserve evidence, defendant did not state that it instructed

15  anyone to preserve evidence.  The response stated only generally that all evidence was collected

16  and preserved. (Dkt. no. 88-2 at 10.)  In response to Special Interrogatory 17, requesting the

17  identity of every person to whom defendant provided a legal hold notice regarding the incident,

18  with "legal hold" defined, *inter alia,* as a preservation order or freeze notice, defendant identified

19  only Karen Glasgow, Assistant Field Solicitor.  (Id. at 11-12.)

20         A further instance of spoliation in regard to the retaining walls was the draft report

21  by Susan Dolan, which contained strong language regarding the condition of the retaining walls

22  that Koontz ordered removed from the report.  (Koontz Dep., dkt. no. 77-3 at 54.)  The draft

23  report was destroyed and has not been produced in this litigation.[3]  Defendant argues that

24  _____

25         [3]  Ms. Johnson stated at her June 11, 2012 deposition that she received a copy of the draft
    report and it is in her office at Lassen, but that she did not bring it with her.  In a declaration
26  dated September 27, 2012, Ms. Johnson states that she conducted a thorough search but was

1    plaintiffs have not been prejudiced by the lack of the draft report because there have been

2    depositions and declarations regarding its content.  Nevertheless, Dolan herself could not recall

3    the content of the "strong statements."[4]  (Dolan Dep., dkt. no. 88-3 at 65.)  Her search of emails

4    which might have contained the language of the draft report came up with no documents,

5    according to a declaration dated September 27, 2012; however, a separate declaration, dated

6    September 4, 2012, states that an attached email, dated August 10, 2009, contains the same

7    content as the draft report she wrote.  (Dkt. nos. 60-2 at 39, 54-3 at 2-4.)  Dolan's observations in

8    that email state that in general, the "the retaining walls (both dry and wet mortared) are in poor

9    condition, with an immediate need for stabilization or rehabilitation to prevent further

10   deterioration."  (Dkt. no. 54-3 at 3.)  Nonetheless, at her deposition, after viewing the language of

11   the alleged draft report that was contained in the August 10, 2009 email, Ms. Dolan testified that

12   the email "is probably extremely similar to the content of [her] draft report to Sean Eagan."

13   (Dolan Dep., dkt. no. 77-5 at 45.)  Her actual testimony was somewhat unsure however:

14        Q.  Do you see [in the email presented to her at the deposition] the, quote, strong

15   statements, end quote, that Mr. Eagan asked you to remove?

16        A.  I cannot recall the exact nature of the strong statements that [Sean] asked me to

17   remove.  I believe they had something to do with the judgment about the poor quality of the

18   construction of the walls.

19        Q.  And now you're looking at your actual report, correct?

20        A.  That's correct.  And I have a vague sense that Sean asked me to recharacterize the

21

22   unable to locate a Draft Dolan Report in electronic or hard copy form.  (Dkt. no. 60-2 at 6, ¶ 4.)
     Defendant stated unequivocally at hearing that the draft report was not preserved.  (Hr'g Tr., dkt.
23   no. 90 at 12.)

24        [4]  Although plaintiffs claim that Koontz and Johnson, who were in receipt of the draft
     report, also could not recall the content of the "strong statements," the deposition pages cited by
25   plaintiffs do not refer to these witnesses' memories of the content of these statements.  (Koontz
     Dep., dkt. no. 88-3 at 19; Johnson Dep., dkt. no. 88-3 at 70.)  Nevertheless, there is no testimony
26   by these witnesses in their depositions as to the exact nature of the "strong statements."

1   poor construction of the walls.

2                                        ...

3       A.  The best answer is I'm sure I did.

4   (Id. at 45-46.)

5               Furthermore, in Sean Eagan's deposition, taken after the hearing on this matter,

6   this witness testified that he could not recall the content of the "strong language" that was taken

7   out of the Dolan draft report.  (Eagan Dep. at 87.)[5]  Contrary to defendant's assertion that

8   plaintiffs were provided with the substance of language used in the draft report in an email, when

9   Mr. Eagan was presented with the email from Dolan to himself, dated December 2, 2009, which

10  purportedly contained the strong language that was taken out, he testified after reading it that

11  "[n]one of the text in this e-mail looks like text that I asked her to remove from the draft report."

12  (Id. at 91.)

13              It may be that the December 2, 2009 email presented to Sean Eagan did not

14  contain the draft language, yet there is evidence that the August, 2009 email did contain this

15  missing language.  Therefore, although plaintiffs *might* now have the language of the draft report

16  as produced in the August 10, 2009 email, defendant made it exceedingly difficult for plaintiffs

17  to discover this email, which is not the actual draft report.  Moreover, it is undisputed that

18  defendant destroyed the draft report.

19              Defendant's argument that Dolan's visit and report are not relevant to the Botell

20  incident because it took place after the incident and was for the purpose of determining historical

21  value, and therefore there was no duty to preserve it, is belied by Koontz's order to take out the

22  strong language and the destruction of the draft of this report.  Additionally, there is evidence that

23  Roth emailed Foster to seek changes to Foster's report, in part based on Susan Dolan's

24  comments.  Roth states in part: "Susan Dolan's comments regarding the condition of the trail

25  _____

26          [5]  This portion of the Eagan transcript was submitted to the court via email from
    plaintiffs' counsel on March 3, 2013.

                                        10

1   seem inappropriate for this report.  Susan is an historic architect, and not a trail building expert.

2   If her comments are to stay in the report, please clarify her role as a historic architect and a report

3   preparer.  Her comments regarding the condition of the trail should be viewed within her scope

4   of knowledge and responsibility." (Dkt. no. 88-3 at 72.)  Yet, in his deposition, when Roth was

5   questioned about whether he had requested any changes to Foster's report, he testified about one

6   change he had requested, but stated that he could not remember any other additional changes.

7   (Id., dkt. no. 88-4 at 4.)

8          Finally, Daniel Jones, as LAVO Chief of Maintenance, testified that he shredded

9   all of his files when he retired in December, 2009 or January, 2010.  (Dkt. no. 77-4 at 14-15.)

10   Some of those files dealt with visitor safety issues in the Park.  (Id. at 13.)

11          Nevertheless, the aforementioned pieces of evidence refute any claim of

12   discretionary function exception in regard to spoliation of evidence pertaining to the retaining

13   wall.  The case cited by plaintiffs is instructive.  In Apple Inc. v. Samsung Elec. Co., 881 F.

14   Supp.2d 1132, 1149 (N.D. Cal. 2012), the court held that failure to turn off an email auto-delete

15   function alone constituted willful spoliation.  Since the material was lost, the court could never

16   know how much relevant material was deleted, but it found it could not ignore the statistical

17   contrast in the number of emails to conclude that the party had consciously disregarded its duty

18   to preserve evidence.  Id.  In a later Apple case, brought on a motion for relief from judgment, the

19   court explained further: "[b]y failing to do as little as issue a litigation hold notice to any

20   employees for eight months after its preservation duty arose, and by further delaying issuance of

21   litigation hold notices to several key custodians, the Court finds that Apple acted with not just

22   simple negligence but rather conscious disregard of its duty to preserve." Apple Inc. v. Samsung

23   Electronics Co., Ltd., 888 F.Supp.2d 976, 998 (N.D. Cal. 2012).  The duty to preserve evidence

24   first arises as soon as a potential claim is identified.  Id. at 991.  Under Ninth Circuit standards,

25   spoliation creates a presumption that the destroyed evidence went to the merits of the action, and

26   that it was adverse to the destroying party.  Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.,

2009 WL 1949124, at *10 (N.D.Cal. July 2, 2009), modified on other grounds, 2009 WL

2485556 (N.D. Cal. Aug. 12, 2009) (citing Phoceene Sous–Marine, S.A. v. U.S. Phosmarine,

Inc., 682 F.2d 802, 806 (9th Cir.1982).

        In this case, the court makes the following findings based on the aforementioned

evidence:

     1.  Defendant destroyed a critical part of the remaining "unsafe" part of the wall for no

apparent purpose, other than to render the scene degraded in terms of any complete investigation.

     2.  Regulations required that the trail be closed for investigative purposes, but the trail

was not totally closed, if at all, and no investigation of the accident site was made until after the

accident site was appreciably changed.

     3.  There is a complete lack of evidence of communication or documentation by Darlene

Koontz concerning her decision to destroy the wall.

     4.  Daniel Jones, as LAVO Chief of Maintenance, should have maintained records

regarding the trail, but he destroyed all of his files when he retired in December, 2009 or January,

2010.

     5.  The original draft of the Dolan report was destroyed after plaintiffs' preservation

request was made.

     6.  No preservation instructions were given to park employees, and as a result many

emails were destroyed.

     7.  Park officials failed to follow policies in regard to the Foster investigation, which

demonstrates that preservation of the wall was material to the investigation.

        Based on the evidence presented, the court can only conclude that defendant's

conduct in spoliating evidence pertaining to the retaining walls was willful and material.  As a

sanction for this conduct, the court recommends that defendant be found negligent for all

purposes in this case, in causing the death of Tommy Botell and injury to plaintiff K.B.

\\\\\

B. Spoliation of Evidence Pertaining to the Discretionary Function Exception

Plaintiffs also seek a recommendation that defendant's third affirmative defense based on the discretionary function exception is not a bar to the claims at issue, based on the spoliation. Therefore, the court has considered plaintiffs' argument concerning spoliation of evidence which might be utilized to seek the discretionary function exception.

Defendant argues that the discretionary function exception to a waiver of sovereign immunity in this FTCA case applies and therefore the court has no jurisdiction over plaintiffs' claims.

1. Standards for Discretionary Function Exception

The discretionary function exception to the FTCA concerns the subject matter jurisdiction of the court. Greene v. U.S., 207 F.Supp.2d 1113, 1118 (E.D. Cal. 2002) (citing Reed v. United States Dep't. of the Interior, 231 F.3d 501, 504 (9th Cir.2000); Vickers v. United States, 228 F.3d 944, 949 (9th Cir.2000)). GATX/Airlog Co. v. United States, 286 F.3d 1168, 1173 (9th Cir.2002), provides a good description of the exception:

> The government has not waived its immunity under the FTCA, however, for claims based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

> 28 U.S.C. § 2680(a). This "discretionary function" exception is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." Gaubert, 499 U.S. at 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (quoting Varig Airlines, 467 U.S. at 814, 104 S.Ct. 2755, 81 L.Ed.2d 660).
>                                              ******

> In Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the Supreme Court laid out a two-part test that governs application of the discretionary function exception. First, for the exception to apply, the challenged conduct must be discretionary—that is, it must involve an element of judgment or choice. This requirement is not satisfied—and the suit may therefore proceed—where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "[i]n this event, the employee has no rightful option but to adhere to the directive." Id. In short, where alleged

13

conduct violates a mandatory directive, it is not discretionary. Gaubert, 499 U.S. at 324, 111 S.Ct. 1267, 113 L.Ed.2d 335; In re Glacier Bay, 71 F.3d 1447, 1452 (9th Cir.1995). Thus, discretion is the benchmark of this self referential prong of the discretionary function test. If the conduct involves choice or discretion, the court must then "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954, 100 L.Ed.2d 531. The focus is on "the nature of the actions taken and on whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325, 111 S.Ct. 1267, 113 L.Ed.2d 335. The decision " 'need not actually be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.' " Nurse v. United States, 226 F.3d 996, 1001 (9th Cir.2000) (quoting Miller v. United States, 163 F.3d 591, 593 (9th Cir.1998)). When a statute or regulation allows a federal employee to act with discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324, 111 S.Ct. 1267, 113 L.Ed.2d 335.

Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged. See Glacier Bay, 71 F.3d at 1451, 1455. The government bears the burden of proving that the discretionary function exception applies. Reed, 231 F.3d at 504.

Greene, 207 F.Supp.2d at 1119-1120 (quoting GATX, 286 F.3d at 1173–74).

## 2. Analysis of Evidence Presented

As a preliminary matter, defendant's argument that this court has no jurisdiction to hear this matter, because it has claimed the discretionary function exception, is meritless. The mere assertion of such a defense does not deprive this court of jurisdiction unless and until the district court rules on the merits of that claimed defense. Here, the district court has previously ruled against defendant in its dispositive motions based on this affirmative defense. (See dkt. nos. 18, 24, 46.) Therefore, this action proceeds with this defense as an assertion only.

In order for the exception to apply, Park officials would have had to possess discretion as to how the wall was to be maintained or fixed, such that events and conditions *prior* to the incident are pertinent, rather than post-accident events. In this regard, plaintiffs point to a specific directive published in the LAVO Environmental Health and Safety Program. The Safety

Directive, titled "Inspection and Hazard Control," states in part:

> A notice of unsafe or unhealthful working condition that is in the imminent danger or serious danger category (Class A) will be drafted by the Team Manager and signed by the Superintendent and immediately posted at or near each place where such hazards are detected.  Each notice shall remain posted until the danger has been abated.

> <u>Employees</u>
> All employees shall correct hazards, if possible, when they locate them.  When unable to effect corrections, they should notify their supervisor, who shall correct the hazards and/or pass the information to the Division Manager, who will take appropriate action.  Hazards which cannot be corrected right away and pose a potential for personal injury and/or property damage should be blocked off, signed, barricaded or other action taken to keep an accident from occurring.
>                              *****

> All facilities shall be maintained to be free of recognized hazards.  Facilities that are substandard and pose hazards to safety and/or health shall be closed, partially closed or use modified patterns pending correction.

(Dkt. no. 88-3 at 31-32.)  Ms. Koontz testified that all portions of the directive set forth above were mandatory.  (Koontz Dep., dkt. no. 88-3 at 11-12, 14, 15-16.)

Here, plaintiffs contend that although defendant claims this exemption, the United States has not produced any responsive documents supporting a decision not to maintain the trail or put warning signs up.  Plaintiffs specifically requested discovery aimed at obtaining production of documents relating to meetings where recordations of discretionary acts might occur.  Plaintiffs point to their request for minutes from meetings concerning the Lassen Peak Trail and the retaining walls; however, there was a gap in production between March, 2009 and November, 2009 when no documents were produced.  (Hr'g Tr., dkt. no. 90 at 36:8-16.)

The shredding of files by Jones was discussed above.  Plaintiffs contend that the seventeen years worth of files shredded by Jones were important because in addition to being Chief of Maintenance at LAVO for this time period including the time of the accident, he was involved in the Reach the Peak project, and had been working on getting the trail repaired since

1   2007.  At his deposition, Jones testified that his library contained documents regarding the trails,

2   the rock retaining walls and safety issues in general.  (Jones Dep., dkt. no. 77-4 at 12-15.)

3              Plaintiffs contend that his library would have related directly to the discretionary

4   function exception, except that this court has no way to know what exactly was shredded.

5   Plaintiffs cite to Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 109 (2nd

6   Cir. 2002) to argue that they should not be prejudiced by the lack of evidence due to destruction

7   in regard to the discretionary function exception.

8               [T]he party seeking an adverse inference must adduce sufficient
                evidence from which a reasonable trier of fact could infer that "the
9               destroyed [or unavailable] evidence would have been of the nature
                alleged by the party affected by its destruction." Kronisch, 150
10              F.3d at 127; Byrnie, 243 F.3d at 110. Courts must take care not to
                "hold[ ] the prejudiced party to too strict a standard of proof
11              regarding the likely contents of the destroyed [or unavailable]
                evidence," because doing so "would subvert the ... purposes of the
12              adverse inference, and would allow parties who have ... destroyed
                evidence to profit from that destruction." Kronisch, 150 F.3d at
13              128; Byrnie, 243 F.3d at 110.

14             In this regard, both parties submit contradictory evidence regarding the documents

15  shredded by Jones.  On the one hand, he testified that he never authored anything dealing with

16  rock retaining walls, and he did not recall any of the shredded documents being specific to trails.

17  (Jones Dep., dkt. no. 82-5 at 3.)  On the other hand, Jones admitted that he did in fact write a

18  memorandum in 1994, addressing the deteriorating walls, their hazardous condition, and visitor

19  safety.[6]  (Jones Dep., dkt. no. 88-2 at 65-68.)  Consequently, for the court to ascertain the truth

20  concerning the documents shredded and whether the discretionary function exception was

21  implicated, an evidentiary hearing would be required.

22             A similar problem arises in regard to the documents shredded by John Roth.

23  Although Jessica Compton observed Chief Ranger Roth shredding documents she had collected

24  in response to discovery propounded by plaintiffs, she admitted at deposition that she does not

25  ─────────────────────

26      [6]  This memo was apparently obtained from Joseph Pettegrew, according to plaintiffs.

know what documents were shredded.  (J. Compton Dep., dkt. no. 77-4 at 39-40.)  What she did

know, however, was that she had a conversation with Roth prior to the shredding, in which he

expressed concern over some of the documents Jessica had collected, which included financial

information, including budgeting for the trail, handwritten notes concerning the Botell incident

taken during meetings, and notes from division chiefs.  (Id. at 32-33.)  Roth, on the other hand,

testified at his deposition that he only shredded duplicates and documents which were

unresponsive to plaintiffs' requests, and that no original documents were shredded.  (Roth Dep.,

dkt. no. 87 at 19-20, 25:21.)  Koontz [7] testified that the only documents removed from those

collected by Jessica Compton were those "that didn't answer the questions [plaintiffs] gave

[them] on that list."  (Koontz Dep., dkt. no. 87 at 44.)  This testimony begs the question: how is it

that these park officials determined which documents were non-responsive to the requests despite

Ms. Compton's opinion that they were responsive, and without the assistance of a lawyer?

Plaintiffs contend that surely financial information and notes from division chiefs are relevant to

defendant's alleged balancing of policy considerations; however, to answer this question, an

evidentiary hearing would be required.

   Further, although Ms. Compton's collection of responsive documents had

included handwritten notes, plaintiffs had never received handwritten notes in this production.

Yet, Koontz did not think any handwritten notes were shredded.  (Id. at 37-40.)  Nevertheless, it

is inconceivable that no handwritten notes exist, since Ms. Compton had collected them, and

there were any variety of meetings where the Botell incident would have to have been discussed

and notes taken.  Yet when plaintiffs made a specific discovery request for "handwritten notes,"

RFP number 83, defendant responded that no such notes were found.  (Dkt. no. 88-5 at 15.)  If

any handwritten notes existed, what they divulged would most likely reveal their thoughts on

---

[7]  Roth brought the documents to meet with Koontz and review them after Jessica
Compton delivered the documents to him, and just before he returned to the office where Jessica
observed him shredding some of them.

1  discretion and/or mandatory policy regarding whether to repair the retaining walls and if not, why

2  not, and consequently whether the discretion function exception applies.  This mystery could

3  only be resolved in an evidentiary hearing.

4          In regard to defendant's failure to instruct employees to preserve evidence and

5  failure to suspend their thirty day auto-delete function in regard to emails, as outlined in the

6  previous section, plaintiffs argue that the discretionary function exception is implicated by virtue

7  of the number of emails not produced.  To make their point, plaintiffs note a stark contrast

8  between the number of emails produced which were authored by high level employees such as

9  Superintendent Koontz (24), LAVO chief Ranger and Collateral Duty Safety Officer Roth (32),

10  LAVO Chief of Maintenance Jones (6), LAVO Trail Crew Leader Pettegrew (21), LAVO Chief

11  Interpretative & Education Officer Haner (12), LAVO Chief of Natural Resources Management

12  Johnson (38), and LAVO Chief of Maintenance Harry (3), as compared to emails discovered on

13  Sean Eagan's laptop (830) in Utah after he left LAVO, outside of the custody and control of

14  LAVO and its high level employees.  (Clark Dec., dkt. no. 54-3 at 12-13.)  Defendant attempts to

15  explain this discrepancy by arguing that Eagan's job was to direct the environmental assessment

16  and coordinate it with the Lassen Peak Trail; therefore, he was typing more emails while other

17  Park employees spent more time out in the Park and not at their desks.

18          Plaintiffs also point to specific emails that they know existed, but which were not

19  produced.  For example, Joseph Pettegrew sent an email to Johnson, Harry, Roth and Haner,

20  dated June 17, 2010.[8]  This email indicates it was replied to, but defendant has failed to produce

21  any replies.  (Dkt. no. 77-4 at 61.)  Gene Compton, a seasonal employee, testified that Pettegrew

22  had complained that emails to Koontz had "vaporized."  (G. Compton Stmt., dkt. no. 77-5 at 16-

23

24          [8]  This email by Pettegew, Maintenance Worker (Trails and Grounds), outlines many
    issues that exist with respect to the trail assessment.  He stated: "I think were [sic] all aware of
25  what can happen if these segments are not addressed before we allow hikers."  His
    recommendation was that the Lassen Peak Trial should remain closed for the 2010 season.  (Dkt.
26  no. 77-4 at 61.)

17.)  Nevertheless, as pointed out by defendant, plaintiffs have produced no proof that any such emails were actually destroyed after the accident.

Evidence provided by plaintiffs to refute the discretionary function exception also include allegedly false statements by Koontz.  Foster testified that he sought to interview Koontz about LAVO employees' statements attempting to warn Koontz of the danger posted by the rock retaining walls, but she declined.  The deposition transcripts would seem to show that Koontz lied under penalty of perjury about Foster's attempts to interview her, denying that she asked not to be interviewed, and testifying that it was the investigator's choice not to talk to her.  (Foster Dep., dkt. no. 77-3 at 15; Koontz Dep., dkt. no. 77-3 at 48-49.)  This sort of evidence goes to Koontz's credibility regarding the discretionary function exception.  In order to determine the truth on this point, whether there is some explanation for these seemingly contradictory statements or whether Koontz did indeed commit perjury, an evidentiary hearing would need to be held.  It is not the function of this court to make such a determination.[9]

The other piece of evidence submitted by plaintiffs also goes to Koontz's credibility.  Koontz allegedly signed a declaration that was false in order to get this case dismissed before discovery could be conducted, in an attempt to establish the discretionary function exception.  In her deposition, Koontz reviewed her declaration which stated that she was unaware of any statute, regulation or policy that prescribed how or when the rock walls should have been maintained or inspected in 2009, and then testified that this answer was true.  (Koontz Dec., dkt. no. 77-3 at 50-52.)  This testimony came after Koontz had just finished testifying that she was aware of a mandatory policy regarding the same subject, requiring closure of facilities that pose hazards.  (Id. at 50.)  Because plaintiffs have not made a motion to dismiss based on

---

[9]  Plaintiffs also bring to the court's attention the fact that LAVO Chief of Maintenance David Harry gave a statement then called Foster to inquire about changing the report.  He was concerned that he was "crossways with other people in the park based on [his] statements." (Foster Dep., dkt. no. 77-3 at 12.)  This evidence also pertains to credibility only, and did not affect the Foster report.  Nor does it imply spoliation.

perjury, but only move for sanctions based on spoliation, the court will not consider this evidence.

This evidence is frankly not sufficient enough for this court to infer spoliation on the discretionary function exception without holding a trial within a trial. *In sum, the undersigned has no strong understanding that anything which might have been destroyed was material vis-a-vis discretionary function.* Plaintiffs draw many inferences that the missing and destroyed evidence relates to the discretionary function exception; however, the law requires that the spoliated evidence be material, that it relate to the issue at hand. The court cannot make such a finding on the present record. As in <u>Residential Funding</u>, 306 F.3d at 109, the evidence presented herein must be presented to a trier of fact who may draw an adverse inference that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." Furthermore, although it boggles the mind that Park officials would have been so inept as to not have created any documents pertaining to a decision not to repair the walls or close the trail because of ....., it is possible that no documents relevant to the discretionary function exception ever existed. Without a trial on the matter, this court will not draw the inference that documents were destroyed where there is the possibility, however slight, that they might never have been created. Most importantly, the undersigned has no opportunity to judge the credibility of these witnesses without live testimony and cross-examination, which is necessary to this determination, and must be accomplished by the district court.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Plaintiffs' motion for sanctions for spoliation of evidence, filed December 24, 2012, (dkt. no. 77), be granted in part and denied in part.

2. The court enter an order, establishing for all purposes in this case, that defendant is deemed to have been negligent in causing the death of Tommy Botell and injury to plaintiff K.B.

1         3. Any determination whether spoilation of evidence precludes the defense of

2    discretionary function be deferred until heard with live testimony.

3         These findings and recommendations are submitted to the United States District

4    Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

5    fourteen (14) days after being served with these findings and recommendations, any party may

6    file written objections with the court and serve a copy on all parties.  Such a document should be

7    captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

8    objections shall be served and filed within seven (7) days after service of the objections.  The

9    parties are advised that failure to file objections within the specified time may waive the right to

10   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11   DATED: March 20, 2013

12

                    /s/ Gregory G. Hollows

13              UNITED STATES MAGISTRATE JUDGE

14

15

16

17

GGH/076

18   Botell1545.san.wpd

19

20

21

22

23

24

25

26